**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SYSTEM OPTICS, INC. d/b/a Novus Clinics, | ) ) ) | CASE NO. 5:20-cv-1072 |
| PLAINTIFF, | ) ) ) | JUDGE SARA LIOI |
| vs. | ) ) | MEMORANDUM OPINION |
| TWIN CITY FIRE INSURANCE COMPANY, et al, | ) ) ) | |
| DEFENDANTS. | ) | |

Like many businesses, plaintiff System Optics, Inc. d/b/a Novus Clinics ("System Optics") has suffered financial losses after being forced to cease or modify its operations due to the COVID-19 pandemic and resulting government closure orders. System Optics sought to recover these loses through its insurance provider, defendant Twin City Fire Insurance Company ("Twin City"), under a commercial policy, and Twin City denied the claim. The instant civil action, removed from state court on diversity grounds, followed. Presently before the Court is Twin City's motion for judgment on the pleadings. (Doc. No. 21 ["MJP"].) System Optics opposes the motion (Doc. No. 22 ["Opp'n"]), and Twin City has filed a reply. (Doc. No. 23 ["Reply"].) For the reasons set forth herein, the motion is granted, and the case is dismissed.

## I. BACKGROUND

System Optics "is the owner and operator of several clinics which . . . provide [a range of "non-essential eye care services" including] optometry services, ophthalmologic services, and ophthalmologic surgery services in the State of Ohio[.]" (Doc. No. 1-1 (Complaint ["Compl."]),

beginning at 8[1], ¶ 1; *see id*. ¶ 15.) System Optics is an Ohio corporation with its principal place of business in Tallmadge, Ohio. (*Id*. ¶ 15.) It operates centers in Alliance, Uniontown, Akron, and Tallmadge, Ohio. (*Id*.) Twin City is an Indiana corporation with its principal place of business in Hartford, Connecticut. (*Id*. ¶ 16.) Defendant Hartford Financial Services Group, Inc. ("Hartford") is a Connecticut corporation. (*Id*. ¶ 17.) Twin City is a subsidiary of Hartford.[2] (*Id*.)

Twin City issued an "all risk" or "special perils" Business Owner's Policy ("Policy"), No. 45 SBA A16052 (effective July 1, 2019 to July 1, 2020), to System Optics. (*Id*. ¶¶ 23–24; *see* Doc. No. 1-1 (Policy), beginning at 26.) The Policy provides that Twin City "will pay for direct physical loss of or physical damage to Covered Property . . . caused by or resulting from a Covered Cause of Loss." (Policy at 59, Special Property Coverage Form ("SPCF") § A.) "Covered Causes of Loss" is defined as "RISKS OF DIRECT PHYSICAL LOSS[,]" unless the loss is specifically excluded or limited in certain other Policy provisions. (*Id*. at 60, SPCF § A.3 [capitalization in original].) With respect to the additional coverage for loss of business income, the Policy provides that Twin City:

> will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration." The suspension must be caused by direct physical loss of or damage to property at the "scheduled premises" . . . caused by or resulting from a Covered Cause of Loss.

(*Id*. at 68, SPCF § A.5.o(1); *see* Compl. ¶¶ 29–31 [referencing Business Income provision].)

The policy further covers "reasonable and necessary Extra Expense you incur during the 'period of restoration' that you would not have incurred if there had been no direct physical loss or physical damage to property at the 'scheduled premises' . . . caused by or resulting from a

---

[1] All page numbers refer to the page identification number generated by the Court's electronic docketing system.

[2] On July 28, 2020, Hartford was voluntarily dismissed from this action. (Doc. No. 13 (Order of Party Dismissal).)

Covered Cause of Loss." (Policy at 68, SPCF § A.5.p(1); *see* Compl. ¶¶ 32–33 [referencing Extra Expense provision].)

Under the Civil Authority provision, the Policy provides that "insurance is extended to apply to the actual loss of Business Income" sustained during a 30-day period "when access to [the] 'scheduled premises' is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate area of [the] 'scheduled premises.'" (Policy at 69, SPCF § A.5.q(1); *see* Compl. ¶ 34 [referencing Civil Authority provision].) There must, therefore, be a "Covered Cause of Loss" in order to recover under the Business Income, Extra Expense, or Civil Authority provisions.

Pertinent to the present motion, by endorsement, the Policy sets forth what Twin City calls the "Virus Exclusion," which states that Twin City:

> will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss:
>
> (1)     Presence, growth, proliferation, spread or any activity of "fungi", wet rot, dry rot, bacteria or virus.
>
> (2)     But if "fungi," wet rot, dry rot, bacteria or virus results in a "specified cause of loss" to Covered Property, [Twin City] will pay for the loss or damage caused by that "specified cause of loss".

(Policy at 159, Virus Exclusion § A.2(i).) The Virus Exclusion applies "whether other not the loss event results in widespread damage or affects a substantial area." (*Id.*)

There are two exceptions to the Virus Exclusion: (1) when the fungi, wet rot, dry rot, bacteria or virus results from "fire or lightning"; or (2) "To the extent it is provided in Additional Coverage – Limited Coverage for 'Fungi', Wet Rot, Dry Rot, Bacteria and Virus with respect to loss other than fire or lightning." (*Id.* at 159, Virus Exclusion § A.2(i).) As will be discussed, for

3

purposes of the present motion, to trigger the Limited Coverage provided for under this endorsement, the loss—unless it results from an equipment breakdown (not relevant here)—must be caused by a Specified Cause of Loss. (Policy at 160, Virus Exclusion § B.1.)

On March 9, 2020, in response to the emerging COVID-19 pandemic, Governor Mike DeWine issued Executive Order 2020-01D, declaring a State of Emergency in Ohio. (Compl. ¶ 3.) In a series of Public Health Orders that followed between March 15, 2020 and March 22, 2020, Governor DeWine and Dr. Amy Acton, Director of the Ohio Department of Health, closed or limited operations of various types of establishments and directed all citizens to stay home unless engaged in essential work or activity. (*Id.* ¶¶ 5–9.) With respect to medical facilities, an order issued on March 17, 2020 temporarily halting all non-essential or elective surgeries or medical procedures. (*Id.* ¶ 7.)

Due to the government closure orders, System Optics was "forced to halt ordinary operations, resulting in substantial lost revenues and forcing [System Optics] to shut down operations and permanently lay off employees." (*Id.* ¶¶ 10, 42.) System Optics sought to recoup some of the estimated $2,000,000.00 in business interruption losses under the terms of the Policy but, on March 23, 2020, Twin City denied the claim. (*Id.* ¶¶ 42–44.)

On April 15, 2020, System Optics filed suit in the Summit County Court of Common Pleas. (Doc. No. 1 (Notice of Removal ["Notice"]) at 1.) The complaint seeks declaratory judgment and also raises claims for breach of contract and bad faith. (*See generally* Compl.) On May 15, 2020, Twin City and Hartford removed the action to federal court. (Notice.) On October 2, 2020, the Court conducted a telephonic case management conference where it set dates and deadlines, including a deadline for early dispositive motions. (Minute Order, 10/02/2020.) Twin

City's motion for judgment on the pleadings was filed on November 13, 2020. It is now fully briefed and ripe for resolution.

## II. STANDARD OF REVIEW

Under Rule 12(c), a party may move for judgment on the pleadings any time after the pleadings are closed but early enough not to delay trial. Fed. R. Civ. P. 12(c). The standard of review for a motion for judgment on the pleadings is the same as for a motion to dismiss for failure to state a claim for relief under Rule 12(b)(6). *E.E.O.C. v. J.H. Routh Packing Co.,* 246 F.3d 850, 851 (6th Cir. 2001) (citing *Grindstaff v. Green,* 133 F.3d 416, 421 (6th Cir. 1998)). To withstand a motion to dismiss pursuant to Rule 12(b)(6), a complaint must plead facts sufficient to state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). Although this pleading standard does not require great detail, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level[.]" *Id.* at 555 (citing authorities).

"'For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment.'" *JPMorgan Chase Bank, N.A. v. Winget,* 510 F.3d 577, 581 (6th Cir. 2007) (quoting *S. Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 479 F.2d 478, 480 (6th Cir. 1973)). The Court, however, "need not accept as true legal conclusions or unwarranted factual inferences." *Mixon v. Ohio,* 193 F.3d 389, 400 (6th Cir. 1999) (citing *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir. 1987)). "The motion is granted when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *Paskvan v. City of Cleveland Civil Serv.*

*Comm'n,* 946 F.2d 1233, 1235 (6th Cir. 1991) (citation omitted).

In ruling on a Rule 12(c) motion, the court considers all available pleadings, including the complaint and the answer. *See* Fed. R. Civ. P. 12(c). "The court can also consider: (1) any documents attached to, incorporated by, or referred to in the pleadings; (2) documents attached to the motion for judgment on the pleadings that are referred to in the complaint and are central to the plaintiff's allegations, even if not explicitly incorporated by reference; (3) public records; and (4) matters of which the court may take judicial notice." *Dudek v. Thomas & Thomas Attorneys & Counselors at Law, LLC,* 702 F. Supp. 2d 826, 832 (N.D. Ohio 2010) (citations omitted).

## III. DISCUSSION

System Optics claims that Twin City breached the insurance contract by denying its claim for losses incurred in connection with the government closure orders and the COVID-19 pandemic, and that Twin City acted in bad faith when it did so without conducting "any reasonable investigation" of the claim under the Policy. (Compl. ¶¶ 55, 61.) Twin City seeks judgment on the pleadings on grounds that coverage is excluded under the Virus Exclusion and because System Optics failed to allege any loss or damage that is covered by the Policy.

The parties agree that Ohio law governs the Court's consideration of the Policy and its provisions. Under Ohio law, "[t]he court's role in interpreting a contract is to 'give effect to the intent of the parties.'" *Fugitec Am., Inc. v. Axis Surplus Ins. Co*., 458 F. Supp. 3d 736, 743 (S.D. Ohio 2020) (quoting *Goodyear Tire & Rubber Co. v. Lockheed Martin Corp*., 622 F. App'x 494, 497 (6th Cir. 2015) (further citation omitted)); *see Ins. Co. of N. Am. v. Travelers Ins. Co*., 692 N.E.2d 1028, 1033 (Ohio Ct. App. 1997) (Under Ohio law, "the interpretation of insurance contracts in the first instance is one of law for the trial court.") (citing *Leber v. Smith*, 639 N.E.2d

1159, 1163 (Ohio 1994)). To that end, "[c]ontract terms are generally to be given their ordinary meaning when the terms are clear on their face," and courts must "apply the plain language of the contract when the intent of the parties is evident from the clear and unambiguous language in a provision." *CoMa Ins. Agency, Inc. v. Safeco Ins. Co*., 526 F. App'x 465, 468 (6th Cir. 2013) (citations omitted); *see Kelly v. Med. Life Ins. Co*., 509 N.E.2d 411, ¶ 1 syllabus (Ohio 1987) ("The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement.") Courts must also read the insurance policy as a whole, giving meaning to each term and construing the provisions within the context of the entire policy. *CoMa Ins. Agency*, 526 F. App'x at 468 (citing *Saunders v. Mortensen*, 801 N.E.2d 452, 455 (Ohio 2004)).

The absence of a definition of a term, however, does not necessarily make the term ambiguous. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 652 N.E.2d 684, 686 (Ohio 1995). Instead, courts must give undefined terms their plan and ordinary meaning unless it results in absurdity, or unless another meaning is "clearly evidenced from the face or overall contents of the agreement." *Sunoco, Inc. (R&M) v. Toledo Edison Co*., 953 N.E.2d 285, 292–93 (Ohio 1995) (quotations marks and citation omitted). When contractual terms are undefined, courts may look to other sources, including Ohio case law, to determine their meaning. *See, e.g., Hewitt v. L. E. Meyers Co*., 981 N.E.2d 795, 800 (Ohio 2012) (reviewing Ohio case law interpreting the phrase at issue).

When the policy language is clear, "[c]ourts may not re-write an insurance [p]olicy[.]" *PI&I Motor Express, Inc. v. RLI Ins. Co*., No. 4:19-cv-1008, 2019 WL 7282098, at *10 (N.D. Ohio Dec. 27, 2019); *see Ins. Co. of N. Am*., 692 N.E.2d at 1033 ("Therefore, a court is

precluded from rewriting a contract when the intent of the parties is evident, *i.e*., if the language of the policy's provisions is clear and unambiguous, the court may not resort to construction of the language."). Accordingly, a court cannot create an ambiguity if none exists. *Lager v. Miller-Gonzalez*, 896 N.E.2d 666, 669 (Ohio 2008); *see Alexander v. Buckeye Pipe Line Co*., 374 N.E.2d 146, 150 (Ohio 1978).

With these considerations in mind, the Court turns to the language of the Policy and the parties' arguments.

### A. Virus Exclusion

Twin City argues that System Optics cannot prevail in this litigation because the Virus Exclusion, which excludes losses caused by, among other things, a virus, applies to all forms of coverage it seeks under the Policy. (Mot. at 400; Reply at 551.) It observes that numerous courts around the country, including courts in this judicial district, "have already concluded that virus exclusions bar coverage for COVID-19 business interruption claims[, and that] "thirteen courts have enforced the exact same exclusion here." (Reply at 551, 552 [collecting cases, including *Santo's Italian Café LLC v. Acuity Ins. Co.*, No. 1:20-cv-1192, —F. Supp. 3d—,2020 WL 7490095, at *14 (N.D. Ohio Dec. 21, 2020)].) Indeed, the clear majority of district courts, including those issuing decisions after Twin City filed its reply, have determined that Twin City's Virus Exclusion (and similar exclusions in other policies) clearly and unequivocally bars recovery of losses associated with government closures due to COVID-19 and the global pandemic. *See, e.g., Q Clothier New Orleans LLC v. Twin City Fire Ins. Co*., No. 20-cv-1470, 2021 WL 1600247, at *7 (E.D. La. Apr. 23, 2021) ("Even if we were to find that physical property damage was sustained, this Court finds that the Virus Exclusion bars [claimant's]

claims."); *Firenze Ventures LLC v. Twin City Fire Ins. Co.*, No. 20-cv-4226, 2021 WL 1208991, at \*4 (N.D. Ill. Mar. 31, 2021) (similar); *J&H Lanmark, Inc. v. Twin City Fire Ins. Co*., No. 5:20-cv-333, 2021 WL 922057, at \*24 (E.D. Ky. Mar. 10, 2021) (similar); *Eye Care Ctr. of New Jersey, PA v. Twin City Fire Ins. Co*., No. 20-cv-5743, 2021 WL 457890, at \*4 (D. N.J. Feb. 8, 2021) (similar).

System Optics offers several arguments in support of its position that the Virus Exclusion nevertheless does not apply because its losses were not "caused" by a virus. None are persuasive. First, focusing on the fact that the loss in question must be the result of "the . . . [p]resence, growth, proliferation, spread or any activity of . . . a virus" for the exclusion to apply, System Optics underscores the fact that it has not alleged that the coronavirus was "present" at any of its facilities.[3] (Opp'n at 435–36 [citing Compl. ¶ 39].) Yet, "presence" is just one of the activities of the virus that can trigger the exclusion. To read a presence requirement into the exclusion would render mere surplusage the other activities of a virus including "growth, proliferation, [and] spread[.]" *See Toledo Newspaper Unions Blade Pension Plan & Tr. Fund v. Nutmeg Ins. Co*., No. 3:09-cv-2252, 2010 WL 1687706, at \*2 (N.D. Ohio Apr. 26, 2010) ("a court must examine 'the insurance contract as a whole,' in order to ascertain the intent of the parties as reflected by the language they used in the contract") (quoting *Chicago Title Ins. Co. v. Huntington Nat'l Bank*, 719 N.E.2d 955, 950 (Ohio 1999)).

---

[3] This is not entirely accurate. The complaint alleges that "[t]he continuous presence of COVID-19 on or around [System Optics'] premises has rendered the premises unsafe or unfit for their intended use . . . ." (Compl. ¶ 39.) For purposes of the present motion, however, the Court will assume that System Optics has not alleged that the coronavirus or COVID-19 was present or detected in any of its facilities.

In support of its position, System Optics cites *Urogynecology Specialist of Florida LLC v. Sentinel Ins. Co.*, 489 F. Supp. 3d 1297 (M.D. Fla. 2020). In *Urogynecology*, the district court looked beyond the plain language of the policy to conclude that "[d]enying coverage for losses stemming from COVID-19 . . . does not logically align with the grouping of the virus exclusion with other pollutants such that the Policy necessarily anticipated and intended to deny coverage for these kinds of business losses." *Id.* at 1302.

Courts have consistently rejected the reasoning in *Urogynecology* and found, with similar exclusions, that there is no stand-alone "presence" requirement as the exclusion is not limited to incidents of contamination on the premises.[4] *See, e.g., 1210 McGavock St. Hospitality Partners, LLC v. Admiral Indem. Co.*, No. 3:20-cv-694, 2020 WL 7641184, at *6 (M.D. Tenn. Dec. 23, 2020) (distinguishing *Urogynecology* "where the defendant produced the entire Policy with its Motion to Dismiss, and the plaintiff does not contend that any exclusions set forth in the Policy are modified by forms that have not been produced to the court"); *Raymond H. Nahmad DDS PA v. Hartford Cas. Ins. Co.*, 1:20-cv-22833, —F. Supp. 3d—, 2020 WL 6392841, at *10 n.5 (S.D. Fla. Nov. 2, 2020) (Virus exclusion applied even though complaint did not allege that

---

[4] System Optics tries to distinguish the cases relied upon by Twin City by noting that those prior decisions were based on virus exclusions that were modeled after the language drafted by the Insurance Service Office ("ISO"), whereas Twin City elected to draft its own exclusion using similar but different language. (Opp'n at 434.) While it argues that the losses covered by Twin City's exclusion are narrower than that drafted by the ISO, it fails to explain why this Court must not given effect to the plain meaning of the words—such as "growth", "proliferation" or "spread"—that do appear in Twin City's exclusion. Further, district courts evaluating Twin City's exclusion have consistently found that the language used by Twin City did not import a "presence" requirement. *See, e.g., J&H Lanmark*, 2021 WL 922057, at *4 (rejecting *Urogynecology* and collecting cases); *Zagafen Bala, LLC v. Twin City Fire Ins. Co.*, No. 20-cv-3033, 2021 WL 131657, at *7 (E.D. Pa. Jan. 14, 2021) ("That the virus may or may not be present at the insured properties is immaterial—the Plaintiffs[] alleged that their losses stem from the [Government] Closure Orders designed to prevent the exposure to COVID-19 and the spread of the virus."); *Eye Care Ctr. of New Jersey, PA*, 2021 WL 457890, at *3 (applying the same exclusion and finding that "there is no textual limitation indicating that the virus must be present at the property. Rather, the clause excludes coverage for losses caused by the spread of viruses generally").

"coronavirus was present at the premises"); *Diesel Barbershop, LLC v. State Farm Lloyds*, 479
F. Supp. 3d 353, 361 (W.D. Tex. 2020) (rejecting identical argument and noting that "it was the
presence of COVID-19 in Bexar County and in Texas that was the primary root cause of
Plaintiffs' businesses temporarily closing"); *see also Barroso v. Twin City Fire Ins. Co*., No.
1:20-cv-632, Doc. No. 23-3 at 4 (E.D. Va. Nov. 10, 2020) (argument that Virus Exclusion
squarely is limited to contamination is "not persuasive"). System Optics specifically alleges that
it was the "community spread of COVID-19 in Ohio" that led to the government closure orders
that halted their operations and resulted in their business income losses. (Compl. ¶ 37; *see id*. ¶
42.) Even if the spread of the virus was not the direct cause of System Optics' losses, by System
Optics' own admission, it was at least an indirect cause, which is sufficient to trigger the Virus
Exclusion.

Next, System Optics posits that its losses were the not the result of a virus, but rather
stemmed from the threat of the proliferation or spread of a disease. It notes that "COVID-19 is
not itself a virus; rather it is a disease suffered by humans and is the cause of the global
pandemic, i.e., the community spread of the disease." (Opp'n at 427, *see id*. 440.) The Court
agrees that there is a distinction between the novel coronavirus and the COVID-19 disease it
causes. The Centers for Disease Control and Prevention ("CDC") has explained that "COVID-19
is a new disease, caused by a novel (or new) coronavirus that has not previously been seen in
humans."  (https://www.cdc.gov/coronavirus/2019-ncov/faq.html#Basics, last visited 5/5/2021).
But this distinction does not help System Optics. It concedes, as it must, that the COVID-19
disease (and the pandemic that resulted) was caused by a virus, and the Virus Exclusion broadly
covers all losses caused "directly or indirectly" by a virus. *See, e.g., Pure Fitness LLC v. Twin*

*City Fire Ins. Co.*, No. 2:20-cv-775, 2021 WL 512242, at \*4 (N.D. Ala. Feb. 11, 2021) ("Plaintiffs offer no basis for construing 'COVID-19' or the 'pandemic' as a non-virus for purposes of [Twin City's] exclusion.") (quotation marks and citation omitted); *Raymond H Nahmad DDS PA*, 2020 WL 6392841, at \*10 (similar); *see also Firenze Ventures*, 2021 WL 1208991, at \*4 (rejecting the argument that the business loss was caused by "aircraft or vehicles" bringing COVID-19 to the United States).

To the extent that System Optics argues that it was the government closure orders (or the government's response to the coronavirus and the COVID-19 pandemic)[5] that caused the business losses, such an argument has been consistently rejected by the courts. Again, the Virus Exclusion applies when the loss is "directly or indirectly" caused by the virus, and the exclusion further applies "regardless of any other cause or event that contributes concurrently or in any sequence to the loss[.]" (Policy at 159, Virus Exclusion § A.2.1.) While the government closure orders may have been the final link in the loss sequence chain, there is no question that the coronavirus was the first link that set the sequence in motion.[6] *See, e.g., MIKMAR, Inc. Westfield Ins. Co.*, No. 1:20-cv-1313, 2021 WL 615304, at \*10 (N.D. Ohio Feb. 17, 2021) ("Even if Plaintiffs are correct that their claimed losses arise from governmental action and not the virus itself, the virus exclusion in MIKMAR's policy applies to loss or damage caused 'directly or

---

[5] Specifically, System Optics posits that "it could be argued, and many have argued, that the Federal Government's slow response was the cause of the spread of COVID-19 and [the] resulting [government closure orders]." (Opp'n at 440.)

[6] Indeed, System Optics pled as much in its complaint. (*See* Compl. ¶ 1 [governor's orders were "part of the State's efforts to slow the spread of the COVID-19 global pandemic"]; *id.* ¶ 37 ["In response to the pandemic, and the community spread of COVID-19 in Ohio, Governor DeWine and Dr. Acton issued the Closure Orders."].) Having tied the government closure orders to the pandemic, and the coronavirus that caused COVID-19 and the resulting pandemic, System Optics cannot suggest that the closure orders were an unrelated intervening event.

indirectly' by a virus."); *J&H Lanmark*, 2021 WL 922057, at *4 (rejecting similar argument and noting that the governor's orders were a "direct response to COVID-19"); *Diesel Barbershop*, 479 F. Supp. 3d at 361 ("While the [governor's] Orders technically forced the Properties to close to protect public health, the Orders only came about sequentially as a result of the COVID-19 virus spreading rapidly throughout the community."); *Raymond H. Nahmad DDS PA*, 2020 WL 6392841, at *9 (collecting cases rejecting argument that government closure orders, rather than the coronavirus, caused the business losses).

While not conceding the issue of causation, System Optics alternatively argues that if a virus is determined to be the root cause of its losses, it is entitled to the time element of coverage provided under Section B.1.f. of the Virus Exclusion. (Opp'n at 436.) Again, Section A of the endorsement generally excludes losses associated with fungi, wet or dry rot, bacteria or virus. (Policy at 159.) Section B carves out of this general exclusion limited coverage for these phenomena under certain specified circumstances. Specifically, § B.1.a. provides:

> The coverage described in 1.b. below only applies when the "fungi", wet or dry rot, bacteria or virus is the result of one or more of the following causes that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence. (1) A "specified cause of loss" other than fire or lightning; (2) Equipment Breakdown Accident occurs to Equipment Breakdown Property, if Equipment Breakdown applies to the affected premises.

(Policy at 160, Virus Exclusion § B.1.a.) Also relevant to the Court's analysis is § B.1.b., which provides:

> We will pay for loss or damage by "fungi", wet or dry rot, bacteria and virus. As used in this Limited Coverage, the term loss or damage means: (1) Direct physical loss or direct physical damage to Covered Property caused by "fungi", wet rot, dry rot, bacteria or virus, including the cost of removal of the "fungi", wet rot, dry rot, bacteria or virus . . . .

(*Id.*, § B.1.b.) Section B.1.b. also provides Limited Coverage for the cost of remediating and testing the property. (*Id.*, Virus Exclusion § B.1.b(2)–(3).)

> System Optics focuses its argument on § B.1.f., which provides as follows:
>
> The following applies only if a Time Element Coverage applies to the "scheduled premises" and only if the suspension of "operations" satisfies all the terms and conditions of the applicable Time Element Coverage. (1) If the loss which resulted in "fungi", wet or dry rot, bacteria or virus does not in itself necessitate a suspension of "operations", but such suspension is necessary due to loss or damage to property caused by "fungi", wet or dry rot, bacteria or virus, then our payment under the Time Element Coverage is limited to the amount of loss and expense sustained in a period of not more than 30 days unless another number of days is indicated in the Declarations. The days need not be consecutive. If a covered suspension of "operations" was caused by loss or damage other than "fungi", wet or dry rot, bacteria or virus, but remediation of "fungi", wet or dry rot, bacteria or virus prolongs the "period of restoration", we will pay for loss and expense sustained during the delay (regardless of when such a delay occurs during the "period of restoration"), but such coverage is limited to 30 days unless another number of days is indicated in the Declarations. The delays need not be consecutive.

(*Id.* at 160–61, Virus Exclusion § B.1.f.) According to System Optics, because § B.1.f does not contain the limitation found in § B.1.a that the damage results from a "specified cause of loss," it is entitled to damages for losses associated with a virus, even if the Virus Exclusion applies. (Opp'n at 438.)

A district court rejected a similar argument involving the exact same Twin City endorsement in *J&H Lanmark*, reasoning:

> The Court declines to view this single provision in isolation. Instead, the Policy, including the Virus Endorsement, must be viewed as a complete document and the terms must be read in a way that gives meaning to all of them, to the extent possible. . . . Subsection (1) of Section B.1.f. contemplates 'the loss which resulted in 'fungi,' wet or dry rot, bacteria or virus." The only loss resulting in virus contemplated by the Policy is that under Section B.1.a. of the Virus Endorsement, which requires the virus to have been caused by a specified cause of loss other than fire or lightning or equipment breakdown.

14

2021 WL 922057, at *4 (case and record citations omitted). The Court finds this analysis persuasive. It is inappropriate to consider § B.1.f. in a vacuum separate and apart from the other provisions in the endorsement. *See Artisan & Truckers Cas. Co. v. United Ohio Ins. Co*., 127 N.E.3d 333, 339 (Ohio Ct. App. 2018) ("The meaning of a contract is to be gathered from a consideration of all its parts, and no provision is to be wholly disregarded as inconsistent with other provisions unless no other reasonable construction is possible") (quotation marks and citation omitted). Each subsection of Section B of the endorsement works in concert to define the contours of the limited coverage provided in this section.[7] To hold otherwise would result in reading the Limited Coverage provision in the Virus Exclusion to subsume the Policy and the exclusion, itself. Because there is no basis upon which to single out subsection f. for separate analysis, the Court finds that it does not provide standalone coverage for losses associated with viruses.[8]

Because § B.1.f. does not provide for standalone coverage, and the endorsement must be read in its entirety, System Optics would only be entitled to Limited Coverage under § B if it could demonstrate that it suffered a "specified cause of loss", which in turn requires "[d]irect physical loss or direct physical damage." (Policy at 160, Virus Exclusion § B.1.a(1) and b(1).)

---

[7] For example, subsection "a" identifies the covered loss, subsection "b" establishes the nature of the loss, and subsection "c" sets the limit of the coverage consistent with the remainder of the Policy. (Policy at 160, Virus Exclusion § B.1.(a)-(c).)

[8] System Optics relies on *Independence Barbershop, LLC v. Twin City Fire Ins. Co*., No. 20-cv-555, 2020 WL 6572428, at *4 (W.D. Tx. Nov. 4, 2020), in which the court summarily determined that § B.1.f. was not limited by the language of § B.1.a. But "courts have declined to follow the *Independence Barbershop* court and found that the Time Element clause does not provide standalone coverage." *Q Clothier New Orleans*, 2021 WL 1600247, at *9 (collecting cases); *see J&H Lanmark*, 2021 WL 922057, at *5 (rejecting *Independence Barbershop* as failing to "apply well-established rules of contract interpretation" requiring consideration of all provisions in a contract).

As discussed below, System Optics cannot. Accordingly, the Virus Exclusion bars recovery under the Policy, and for this reason alone, Twin City is entitled to judgment on the pleadings.

### B.        Covered Cause of Loss

Even if the Virus Exclusion did not apply, however, Twin City argues that System Optics' alleged losses would be excluded under the plain terms of the Policy. The Business Income, Extra Expense, and Civil Authority provisions of the Policy provide coverage for damages resulting from a "Covered Cause of Loss[,]" which (consistent with the endorsement) is defined as "direct physical loss of or physical damage to property[.]" (Policy at 68 (Business Income); *see id*. at 69 (Civil Authority).) While there is no dispute that coverage under the Policy requires a direct physical loss of or physical damage to property, System Optics maintains that it has sufficiently pled such a loss by averring that "[t]he continuous presence of COVID-19 on or around [System Optics'] premises has rendered the premises unsafe and unfit for their intended use and therefore caused direct physical property damage or physical loss under the Policy." (Compl. ¶ 39; *see* Opp'n at 444.)

In support of its position that temporary impairment of property for its intended use qualifies as "direct physical loss of or physical damage to property[,]" System Optics relies on two unreported decisions from outside this judicial district and written by the same district court: *Blue Springs Dental Care, LLC v. Owners Ins. Co*., 488 F. Supp. 3d 867 (W.D. Miss. 2020); *Studio 417, Inc. v. Cincinnati Ins. Co*., 478 F. Supp. 3d 794 (W.D. Miss. 2020). In *Studio 417*, the court reasoned that because COVID-19 is a "physical substance" that is "emitted into the air[,]" its impact upon the insured's property rendering it unsafe for its intended use and requiring the closure of the business resulted in a direct physical loss. *Studio 417*, 478 F. Supp.

16

3d at 800. The court in *Blue Springs Dental Care* employed a similar rationale to find the closures of the dental practices resulted in a direct physical loss. *Blue Springs Dental Care*, 488 F. Supp. 3d at 873–4.[9]

But the fact that the virus causing COVID-19 may be a physical substance does not necessarily transform the purely economic loss sustained as a result of it into a direct physical one. Twin City argues that *Studio 417* and *Blue Springs Dental Care* represent an extreme minority and that the clear majority of courts have determined that "COVID-19 business income losses do not involve direct physical loss or damage." (Reply at 565.) Twin City is correct that "[t]he majority of courts to address the issue . . . have found that COVID-19 and governmental orders closing businesses to slow the spread of the virus do not cause physical damage or physical loss to insured property." *See Uncork & Create LLC v. Cincinnati Ins. Co.*, No. 2:20-cv-401, 2020 WL 6436948, at *4 (S.D. W.Va. Nov. 2, 2020) (collecting cases). These courts have consistently concluded that a direct physical loss requires more than a temporary impairment to or limitation on the use of the property—i.e., the loss must bear a negative causal relationship to the physical condition of the property itself.[10] *See, e.g., Promotional Headwear*

---

[9] It is worth noting that the complaint in *Blue Springs Dental Care* also contained allegations that the closures were necessitated to prevent physical damage to the property by the presence and proliferation of the virus and the physical harm to persons present there. *Id.* Indeed, in both cases, the insureds alleged that COVID-19 was present at their facilities, something System Optics underscores it did not allege. *Id.*; *see Studio 417*, 478 F. Supp. 3d at 800 (alleging COVID-19 "attached" to the surfaces of the insured's property).

[10] In denying an insurance claim for financial losses resulting from a temporary closure of the insured's business, a district court in the Northern District of Illinois astutely observed that "[c]oronavirs does not physically alter the appearance, shape, color, structure, or other material dimension of the property. Consequently, [the insured] has failed to plead a direct physical loss—a prerequisite for coverage." *Sandy Point Dental, PC v. Cincinnati Ins. Co.*, 488 F. Supp. 3d 690, 694 (N.D. Ill. 2020).

*Int'l v. Cincinnati Ins. Co*., No. 20-cv-2211, 2020 WL 7078735, at *8 (D. Kan. Dec. 3, 2020) ("even assuming that the virus physically attached to covered property, it did not constitute the direct, physical loss or damage required to trigger coverage because its presence can be eliminated"); *Real Hospitality, LLC v. Travelers Cas. Ins. Co. of Am*., No. 2:20-cv-87, 2020 WL 6503405, at *7 (S.D. Miss. Nov. 4, 2020) ("An insured cannot recover by attempting to artfully plead temporary impairment to economically valuable use of property as physical loss or damage . . . .") (quoting *10E, LLC v. Travelers Indem. Co. of Conn*., No. 2:20-cv-4418, 2020 WL 5359653, at *4–5 (C.D. Cal. Sept. 2, 2020)).

This definitive majority includes courts reviewing Twin City's policies. *See, e.g., TAQ Willow Grove, LLC v. Twin City Fire Ins*., No. 20-3863, 2021 WL 131555, at *5 (E.D. Pa. Jan. 14, 2021) (denying coverage for losses from COVID-19 closures and finding that, under Pennsylvania law, direct physical loss required that "the loss and the bar to operation from which it results must bear a causal relationship to some *physical condition* of the premises") (emphasis in original, internal quotation marks and citation omitted); *Ultimate Hearing Solutions II, LLC v. Twin City Fire Ins. Co*., No. 20-cv-2401, 2021 WL 131556, at *8 (E.D. Pa. Jan. 14, 2021) (similar); *Firenze Ventures*, 2021 WL 1208991, at *5 (similar). Courts looking at this or similar provisions have reasoned that the language "direct physical loss," though undefined in the policies, has within its plain meaning a requirement that there be some physical damage or alteration to the property. *See, e.g, Q Clothier New Orleans*, 2021 WL 1600247, at *7.

For example, a district court in this judicial district recently held that loss of business income due to COVID-19 did not constitute a "direct physical loss" because it lacked "anything that could be remotely considered 'physical damage' as construed" under Ohio law. *Santo's*

*Italian Café*, 2020 WL 7490095, at *8–9. In reaching this conclusion, the court relied on *Mastellone v. Lightning Rod Mut. Ins. Co*., 884 N.E.2d 1130, 1143 (Ohio Ct. App. 2008), a state appellate court decision that examined the related term "physical injury." In *Mastellone*, the court held that the plain and ordinary meaning of the term "physical injury" in a home owners' policy envisioned a "harm to the property that adversely affects the structural integrity of the house." The court in *Santo's* further noted that the decision in *Mastellone* was cited favorably in *Universal Image Prods., Inc. v. Fed. Ins. Co*., 475 F. App'x 569, 572–4 (6th Cir. 2012) (applying Michigan law), where the Sixth Court found that leased office space that experienced an odor caused by microbial contamination did not result in a "direct physical loss or damage to" it because there was no tangible loss or damage to the property and it was not rendered "uninhabitable or substantially unusable." The court in *Santo's* concluded that, taken together, these decisions signal that "direct physical loss" must include physical damage that destroyed, compromised, or otherwise impacted the property. *Santo's*, 2020 WL 7490095, at *9.

The Court agrees that, under Ohio law, "direct physical loss" requires some actual harm to the structure rendering it uninhabitable or unusable, and that "superficial or intangible effects" of a government closure due to the spread of COVID-19 represent purely economic losses that do not trigger coverage. *See MIKMAR*, 2021 WL 615304, at *6 (finding that, under Ohio law, "direct physical loss" requires "actual harm to a structure, not superficial or intangible effects"). Moreover, a finding that mere loss of use satisfied the "direct physical loss" requirement would make no sense when read with the "period of restoration" language in the Policy. Business Income and Extra Expense coverage is only available during a "period of restoration" during which the property is either "repaired, rebuilt or replaced with reasonable speed and similar

quality." (Policy at 82, § G.12.b(1); *see id*. at 68.) Built into the coverage for these type of losses is the expectation that there has been some type of physical damage that would need to be repaired, rebuilt, or replaced.[11] *See TAQ Willow Grove*, 2021 WL 131555, at *6 (finding mere loss of use insufficient to establish "direct physical loss" when read in conjunction with the "period of restoration"); *Ultimate Hearing*, 2021 WL 131556, at *7 ("If mere loss of use counted as 'direct physical loss of' property, the 'period of restoration' language would be rendered a nullity."); *Zagafen Bala, LLC v. Twin City Fire Ins. Co*., No. 20-cv-3033, 2021 WL 131657, at *6 (E.D. Pa. Jan. 14, 2021) (similar).[12]

Notwithstanding System Optics' vague references to "direct physical damage" from the spread of COVID-19 "on or around" its premises, it has not alleged that the government closure orders resulted in "direct physical loss" to the covered premises, such that it would have been able to recover its economic losses under the Business Income, Extra Income, or Civil Authority provisions in the Policy. Accordingly, System Optics is not entitled to a declaration that Twin City must cover its business interruption losses and Count I (Declaratory Judgment) is dismissed.

---

[11] The Policy does not limit Civil Authority damages to a "period of restoration." However, Civil Authority coverage is still premised on the existence of a "Covered Cause of Loss", which, as previously observed, requires a "direct physical loss[.]" (Policy at 69, SPCF § 5.q(1).)

[12] As the parties have demonstrated through their supplements and notices of supplemental authority, the body of case law addressing the issues surrounding insurance coverage for COVID-19 losses continues to grow. (*See, e.g*., Doc. Nos. 24, 27, 29–32.) Recently, another court in this district found that the term "direct physical loss" was ambiguous and that the insured had sufficiently pled that interruptions to business operations due to COVID-19 were compensable under the policy. *See Henderson Road Rest. Sys., Inc. v. Zurich Am. Ins. Co*., No. 1:20-cv-1239, 2021 WL 168422, at *10 (N.D. Ohio Jan. 19. 2021). The Court respectfully disagrees with the decision in *Henderson Road*, as it finds that the decision does not reconcile the "direct physical loss" language with the provisions providing for a "period of restoration" requiring the repair, rebuilding, or replacing of the covered property. *See Kahn v. Penn. Nat'l Mut. Cas. Ins. Co.*, No. 1:20-CV-781, 2021 WL 422607, at *7 (M.D. Pa. Feb. 8, 2021) (finding *Henderson Road* unpersuasive for similar reasons); *Family Tacos, LLC v. Auto Owners Ins. Co*., No. 5:20-cv-1922, 2021 WL 615307, at *11 (N.D. Ohio Feb. 17, 2021) (rejecting *Henderson Road*); *Tria WS LLC v. Am. Auto. Ins. Co.*, No. 20-cv-4159, 2021 WL 1193370, at *7 n.5 (E.D. Pa. Mar. 30, 2021) (similar).

### C.     Breach of Contract

"To establish a claim for breach of contract, a plaintiff must prove: (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damages or loss resulting from the breach." *In re Fifth Third Early Access Cash Advance Litig.*, 925 F.3d 265, 276 (6th Cir. 2019) (applying Ohio law). Because the Policy does not provide coverage for the economic losses sustained and alleged by System Optics, Twin City did not breach the contract by denying Twin City's claim. Therefore, the Court dismisses Count II (Breach of Contract).

### D.     Bad Faith

As discussed, the Policy does not provide coverage for System Optics' claimed losses. Accordingly, Twin City's denial of coverage was reasonable, and there can be no bad faith. *See Cleveland Freightliner, Inc. v. Federated Serv. Ins. Co.*, No. 1:09-cv-1108, 2010 WL 395626, at *13 (N.D. Ohio Jan. 26, 2010) ("Ohio law clearly states if denial of coverage is appropriate there is no bad faith.") (citation omitted). Because Twin City acted appropriately by denying coverage, the Court dismisses Count III (Breach of the Duty of Good Faith and Fair Dealing).

## IV. CONCLUSION

While the Court is sympathetic to the plight of businesses like System Optics that have suffered real and substantial economic losses during the COVID-19 pandemic, it is without authority to re-write Twin City's Policy to provide for coverage. For all the foregoing reasons,

Twin City's motion for judgment on the pleadings is GRANTED and this case is DISMISSED.

**IT IS SO ORDERED**.

Dated: May 24, 2021

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**